IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 18, 2021 Session

## STATE OF TENNESSEE v. DONALD RAY PENNINGTON, JR.

**Appeal from the Criminal Court for Bradley County**
No. 17-CR-307    Sandra Donaghy, Judge
_____

**No. E2020-00415-CCA-R3-CD**
_____

The Bradley County Grand Jury indicted Defendant, Donald Ray Pennington, Jr., for two counts of rape of a child. Following a trial, a jury found Defendant guilty of rape of a child in count 1 and the lesser-included offense of aggravated sexual battery in count 2. On appeal, Defendant asserts that: (1) the evidence is insufficient to support his conviction for rape of a child; (2) he is entitled to relief under plain error due to prosecutorial misconduct; and (3) the trial court erred in imposing consecutive sentences. Following a thorough review of the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jessica F. Butler, Assistant Public Defender, Tennessee District Public Defenders Conference, Franklin, Tennessee (on appeal); and Richard Hughes, District Public Defender; John Fortuno and Larry Wright, Assistant District Public Defenders, Cleveland, Tennessee (at trial), for the appellant, Donald Ray Pennington, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Stephen D. Crump, District Attorney General; and Krista Oswalt and Dallas Scott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

### *Trial*

At trial, R.R.[1] testified that, on June 10, 2017, when she was eleven years old, she lived in Cleveland in a double-wide trailer with her mother, her siblings, and her stepfather, Defendant. R.R. recalled that, when she woke up that morning, she wanted to go swimming in their backyard pool. She went into the bedroom that Defendant shared with her mother where Defendant and R.R.'s two sisters were watching television. R.R. said that her sisters were sitting on the floor at the end of the bed and that Defendant was sitting on the bed near the headboard. R.R. recalled that her sisters were about eight and "six or seven" years old at the time. R.R. testified that she asked Defendant if she could go outside, but he responded, "[W]ell, let's watch a movie." R.R. stated that, as she began watching the movie, Defendant told her two sisters to leave the room. R.R. recalled that she had on a blue two-piece swimming suit and water shoes and that Defendant had on camouflage pajama pants and camouflage boxers. She said that, when her sisters left the room, they closed the door, and Defendant locked it. R.R. was sitting up on the bed watching the movie, and Defendant told her to "come here" and to lie down on the bed. R.R. stated that she crawled up the bed and laid down beside Defendant. R.R. explained that she was lying on her back and that Defendant was lying on his side.

R.R. stated that Defendant turned off the movie and began touching her. The following exchange then occurred between the prosecutor and R.R.:

> [THE STATE]: Okay. Tell me about that?
>
> [R.R.]: He decided to move my bathing suit bottom to the right, and he decided to touch me with his hand.
>
> [THE STATE]: I know this is difficult, but I have to ask you details about it. You said he's touching you with his hand. Where on your body is he touching you with his hand?
>
> [R.R.]: On my private.
>
> [THE STATE]: Your private. Okay. Front or the back?

---

[1] It is the policy of this court to identify minors by their initials only. No disrespect is intended.

[R.R.]: Front.

[THE STATE]: And when you say he's touching you, how is he touching you? What motion? Is he making a motion or just?

[R.R.]: He was moving up and down.

[THE STATE]: With his hand?

[R.R.]: Yes.

[THE STATE]: Okay. When he was moving up and down, did he stay on top of your privates? Or did he go in between, or inside of you?

[R.R.]: In between.

R.R. recalled that Defendant then got on top of her. She said, "[Defendant] pulled out his private[,] and he put it inside of mine." She said that Defendant's "private" felt "soft" and "slimy." She said that she felt pain and that "[i]t burned, and then it started tingling." R.R. continued, "And then . . . he handed me a phone for a little bit, but I can't remember the rest. But suddenly when I start to remember, I have to use the bathroom." She said that she left his bedroom and went to the bathroom. She then climbed out of her bedroom window. R.R. said that she did not see anything come out of Defendant's "private."

R.R. testified that, at the time of the incident, Defendant had been her stepfather for about two years. She said that their relationship was not a good one, but she denied that she wanted Defendant "out of [her] life." She said that she did not like Defendant because he would punish her. She stated, however, that she did not want Defendant to leave their family because her mother loved him. R.R. stated that her mother was at work at the time of the incident and that she did not tell her mother what happened when she returned home that night because she was scared. R.R. testified that she told her mother the next day. R.R. denied that she made up the incident to get Defendant out of her life or out of the home.

On cross-examination, R.R. denied that her mother and Defendant were arguing before she told her mother about what Defendant did to her. She stated, "They weren't arguing until after I told her." She recalled that, when she told her mother about the incident, she first asked her mother what the word "rape" meant and that her mother told her. R.R. denied hearing about rape from a friend at school. She agreed that she met with Mattie Torbett for an interview on June 12, 2017, and after refreshing her recollection with

a transcript of the interview, she agreed that she told Ms. Torbett that a friend's dad had to go to jail because "someone thought he had raped their daughter when he was baby sitting[.]" R.R. stated that Defendant never put his fingers "inside" her vagina. She agreed that she told Ms. Torbett that Defendant put his penis inside her and that he "went up and down, up and down." She further agreed that she told Ms. Torbett that she felt a "sharp pain" in her hip area. R.R. stated that, when she left Defendant's bedroom, her siblings were playing in the living room with blocks and that she had to console her sister, D.R., because the other children would not let D.R. play with the blocks. She agreed that she did not tell Ms. Torbett that she climbed out of her bedroom window following the incident.

On redirect examination, R.R. agreed that she told Ms. Torbett that Defendant attempted to put his finger "inside" her vagina and that Defendant got on top of her and "put his penis inside of [her]."

The victim's mother testified that she married Defendant on April 23, 2016, and that they were still married on June 10, 2017. The victim's mother explained that they lived with her four children from a previous relationship and Defendant's son. She recalled that, on June 10, 2017, she left the house around 8:00 a.m. to go to work and that Defendant watched the children while she was gone. She said that she worked until about 8:00 p.m. and that, when she returned home, the children were in bed. The victim's mother stated that, the following day, Defendant was out in a storage building on their property, and the children were outside playing. She recalled that R.R., who was eleven years old, came into the bedroom and wanted to talk to her. R.R. closed the door and then told her what Defendant had done the previous day. The victim's mother testified that she called her children into the house, locked the doors, and told them not to open them. The victim's mother confronted Defendant, and they began arguing. She asked Defendant if he would "like to tell [her] what happened yesterday." The victim's mother explained that she did not tell Defendant which child talked to her but that Defendant responded, "[W]hatever that little 'B' said is a lie." The victim's mother testified that, after confronting Defendant, she loaded her children into the car, called the police, and drove to the hospital.

The victim's mother stated that R.R. had a "normal stepdad, stepdaughter relationship." She said that there was occasional arguing but that R.R. "eventually called him dad. So she liked him." The victim's mother explained that she and her children moved out and into a domestic violence shelter because she lost her job. She said that she had no plans to leave Defendant prior to the offense and stated that she had "loved [Defendant] more than anything."

On cross-examination, the victim's mother agreed that R.R. asked her what the word "rape" meant when R.R. approached her on the morning of June 11. The victim's mother said that she did not tell R.R. what it meant and, instead, asked R.R. what R.R. thought

rape was. The victim's mother agreed that she took R.R. to the Children's Advocacy Center in Athens to speak to Ms. Torbett on June 12, but she denied telling her other daughter, D.R., about the abuse R.R. disclosed.

Kelly Dockery testified that she was a registered nurse who worked as a Sexual Assault Nurse Examiner at the Children's Advocacy Center in Athens. Nurse Dockery said that she examined R.R. on June 11, 2017. She recalled that R.R. was friendly but shy and nervous. Nurse Dockery first conducted a physical exam, which she explained was similar to a "well child check" at a doctor's office. She also examined R.R.'s genitals and conducted a rape kit on R.R., which she provided to the investigating officer. Nurse Dockery stated that she found no trauma or injury to R.R.'s vaginal area, but she opined that such a finding was not abnormal in child sexual assault cases. She said that "[n]inety-five percent of the time you won't find any injuries." She explained:

> Children have different meanings for penetration. Are they meaning that penetration went directly through the vaginal canal? Or are they talking penetration -- just went through the -- it's called labia majora, which are the outer lips of the vagina. Did it just cross that?

> Different -- depending on what kind of force was used, usually I won't find trauma if there wasn't a lot of force. And also the nature of the penetration. Was it an erect penis? Was it not an erect penis? Was it soft tissue trying to pass through their vagina? So those . . . are some of the reasons why I won't find injuries.

When asked about why R.R. would have reported pain when Nurse Dockery could see no injury, Nurse Dockery responded, "Well, if the hymen is not estrogenized, it's very painful for the hymen to be touched for a pediatric female." She agreed that, based on her findings, she could not confirm or deny that a sexual assault took place.

Special Agent Kim Lowe testified that she was employed by the Tennessee Bureau of Investigation in the Forensic Biology Division of the Knoxville Crime Laboratory. Agent Lowe stated that she analyzed specimens from the rape kit conducted on R.R., looking for the presence of semen and skin cells containing male DNA. She said that she was unable to locate semen or skin cells containing male DNA in the specimens. She explained that skin cells "don't last as long . . . depending on what the person had done, showered, etcetera, they can be gone pretty quickly a couple of hours afterwards." Agent Lowe said that foreign skin cells could also be removed if a victim "[u]rinate[d] and wipe[d] pretty frequently[.]" Agent Lowe agreed that she was not provided with any clothing or bedding associated with the case for testing.

Ten-year-old D.R. testified that she was R.R.'s sister. She recalled that, on June 10, 2017, she had lived in Cleveland with her mother, siblings, and Defendant, whom she had referred to as "Dad." About that day, D.R. testified that she and her younger sister woke up and went into the bedroom shared by her mother and Defendant to watch television. She recalled that Defendant was in the bedroom sitting on the bed and that she and her younger sister sat in the floor. D.R. said that her mother was at work. D.R. said that R.R. came into the bedroom and asked if they could go outside and that Defendant told R.R. that they could if R.R. first lay down beside him on the bed. D.R. said that Defendant told her and her younger sister to leave the bedroom and close the door behind them. She recalled that, as she left the room, she saw R.R. crawling on Defendant's bed. D.R. stated that she went into the living room and sat behind a couch waiting for R.R. to come out of the bedroom. D.R. recalled that, while R.R. was in Defendant's bedroom, D.R. tried to open the bedroom door but found it locked. She knocked on the door, but no one answered it. She said that, after a "long time[,]" R.R. ran out of Defendant's bedroom crying with her hands over her face. R.R. ran into her bedroom, closed and locked the door, and would not open the door for D.R.

On cross-examination, D.R. recalled being interviewed by Ms. Torbett at the Children's Advocacy Center. She recalled telling Ms. Torbett that Defendant called R.R. into the bedroom and told her to do laundry. She acknowledged that she told Ms. Torbett that R.R. came into the bedroom and that Defendant "shanked" R.R., meaning that he pulled down her pants and underwear as a practical joke. She agreed that she told Ms. Torbett that she saw R.R. lying on Defendant's bed and that R.R. appeared to be "blacked out." D.R. also recalled telling Ms. Torbett that, when R.R. came out of Defendant's bedroom, R.R. was wearing different underwear than what she had on when she entered the room. D.R. said that she later asked R.R. what had happened and that R.R. replied, "[L]eave me alone."

During closing argument, the State elected that count 1 involved the digital penetration of R.R. by Defendant and that count 2 involved the penile penetration of R.R. by Defendant. Following deliberations, the jury found Defendant guilty of rape of a child in count 1 and the lesser-included offense of aggravated sexual battery in count 2.

### Sentencing

At a sentencing hearing, the State introduced the presentence report into evidence and called the victim's mother to provide victim impact testimony. The victim's mother stated that Defendant's sexual abuse of R.R. greatly impacted R.R.'s grades and social life. She stated that R.R. "went from having good grades to . . . having to work very, very hard just to get by; not only socially, but educationally." The victim's mother explained that, prior to the offenses, R.R. was a happy, outgoing, energetic child but that R.R. was now

"very quiet" and "tortured." She said that R.R. no longer liked to go out in public. She further explained that she, R.R., and her other children had to move out of their home and into a shelter because of Defendant's actions. She said that R.R. and her other children had thought of Defendant as a "father figure" and that they had grown to love him prior to the offenses. The victim's mother stated, "[Defendant] promised to help me, not make it harder. He's supposed to nurture her, not scar her forever. And I can never take this away from her."

Tammy Pennington, Defendant's mother, testified that she, Defendant, and Defendant's father moved to Tennessee from West Virginia in 2004, when Defendant was eighteen years old. Mrs. Pennington recalled that Defendant dropped out of school in the ninth grade. She said that Defendant had "a memory problem because of . . . encephalitis," which he contracted from a mosquito. She explained that it caused Defendant's brain to swell, that he was in a "semi-coma" for two weeks, and that he almost died. Mrs. Pennington testified that Defendant had been married twice and that he had an eight-year-old son with his first wife. She described Defendant as being "good with his son" and said their relationship was "close." She said that, to her knowledge, Defendant had never done drugs. She said that Defendant had worked at an animal shelter when his son was a baby but that he had "lost his job."

Defendant testified that he was thirty-three years old. Defendant's testimony was consistent with Mrs. Pennington's regarding his early life. He said that, due to his contracting encephalitis at age twelve, he suffered from learning disabilities and both short-term and long-term memory problems. Defendant said that he had custody of his son for most of his son's life, and he described some of the activities that they liked to do together. Defendant said that he had been in custody for fifteen months and that, during that time, he had not been in any fights or had any write-ups. Defendant denied R.R.'s allegations of sexual abuse.

At the close of proof, the trial court stated that it had considered the evidence from trial, the evidence from the sentencing hearing, the presentence report, the nature of the criminal conduct involved, enhancement and mitigating factors, statistical information provided by the Administrative Office of the Courts, arguments by counsel, Defendant's own statement, and Defendant's potential for rehabilitation. The trial court noted that it was required to sentence Defendant as a Range II offender for his conviction for rape of a child pursuant to Tennessee Code Annotated section 39-13-522(b)(2)(A). The trial court reiterated the testimony from the victim's mother that "when [Defendant] entered that household, [he] promised to nurture those children, and specifically the victim in this case R.R., not scar the child forever." The court noted that, in his statements to the presentence report writer, Defendant continued to deny the allegations against him. Defendant said that he thought that R.R., the victim's mother, or the jury should have to tell his son that

Defendant was not "coming home." The trial court found that Defendant had no prior record, that Defendant had little work history, that Defendant had not finished his high school education, and that Defendant told the presentence report writer that he suffered from anxiety, depression, ADHD, learning disabilities and memory problems. The court noted that the Strong R Risk Assessment indicated that Defendant had a moderate risk to reoffend. The trial court found that Defendant was convicted of a violent crime against a person. It noted that Defendant's sentence range for the rape of a child conviction was twenty-five to forty years and that the sentence range for the aggravated sexual battery conviction was eight to twelve years.

Regarding enhancement factors, the trial court found that the offenses involved a victim and were committed "to gratify Defendant's desire for pleasure or excitement." The court stated that the offenses were "crimes committed by an adult on a child, at a time when the . . . sisters were ordered out of the room, showing that [Defendant] wanted privacy to do it, there can be no other reason other than to gratify your desire for pleasure or excitement." The trial court further considered that the enhancement factor that Defendant abused a position of private trust. The court explained, "The mother of . . . this child went to work, and she left you as the caretaker. She established a trust relationship where you were to guard and protect these children. You were [the] stepfather -- to this [eleven-]year[-]old." As to mitigating factors, the trial court stated that, although Defendant suffered from encephalitis as a child and this affected his ability to learn, "I don't see that that mitigates in any regard the conduct between you and that child."

The trial court noted that, in the presentence report, Defendant stated that his conviction was unfair and based on a false allegation. He alleged that the victim had disliked him because he had given her too many chores and that the victim's mother had been complicit in the false allegation because Defendant had wanted to divorce her. Regarding Defendant's potential for rehabilitation, the trial court stated:

> Is there a potential for rehabilitation? One of the requirements of this sentence is that you be on the sex offender registry, and that you comply with the directives for sex offender treatment. They will not only compel you to go through treatment, but you'll have mandatory polygraphs as a part of that mandated treatment. I . . . don't know of the probability of rehabilitation, if you refuse to accept responsibility.

The trial court then considered the discretionary consecutive sentencing factors found in Tennessee Code Annotated section 40-35-115, noting that "[w]hen a Defendant is convicted of two or more statutory offenses involving sexual abuse of a minor, then that is a factor that could be considered in discretionary consecutive sentencing." The court also found that confinement was necessary "to avoid depreciating the seriousness of the

offense" and that "confinement [was] particularly suited to provide an effective deterrent to others likely to commit similar crimes."

Based on these considerations, the trial court sentenced Defendant, as a Range II offender, to thirty years for rape of a child and, as a Range I offender, to ten years for aggravated sexual battery. The court ordered Defendant to serve the sentences consecutively, noting that "they are crimes against nature, involving sexual conduct[,]" for a total effective sentence of forty years in the Tennessee Department of Correction.

Defendant filed a timely motion for new trial, which was denied following a hearing. This timely appeal follows.

## II. Analysis

### A. Sufficiency of the Evidence

Defendant contends that the evidence is insufficient to sustain his conviction for rape of a child, arguing that the State failed to establish the element of digital penetration of R.R. by Defendant. Defendant argues that there was a lack of physical evidence of penetration, that R.R. stated multiple times that Defendant's fingers never went "inside" her vagina, and that R.R.'s testimony "[did] not provide any basis for the jury's determination that [his] hand or finger entered the labia or vulva in any way." The State responds that the evidence is sufficient to support Defendant's conviction for rape of a child. We agree with the State.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence

and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2017). "Sexual penetration" is defined as: "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7) (2017). Additionally, "[i]t is not necessary that the vagina be entered or that the hymen be ruptured; the entering of the vulva or labia is sufficient." *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (citing *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)).

When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's conviction for rape of a child in count 1. In closing argument, the State asserted that count 1 involved the digital penetration of R.R. by Defendant. R.R. testified that, on June 10, 2017, when she was eleven years old, she entered the bedroom Defendant shared with her mother and asked if she could go outside. Defendant said that he wanted her to watch a movie with him and instructed her to get on the bed. Defendant then made R.R.'s two younger sisters leave the room and close the door behind them. Defendant locked the bedroom door and got on the bed, lying beside R.R. R.R. testified that Defendant turned off the movie and began touching her under her bathing suit bottom. She stated that Defendant used his hand to touch her "front private" and that he moved his hand "up and down." During her forensic interview following the offense, R.R. told Ms. Torbett that Defendant attempted to put his finger "inside" her vagina. At trial, R.R. was asked if Defendant's hand stayed "on top of" her private "[o]r did he go in between, or inside of you[,]" and R.R. responded that Defendant went "[i]n between." From this testimony, we conclude that a rational juror could have found beyond a reasonable doubt that digital penetration, however slight, of the outer folds of R.R.'s vagina occurred, and this is sufficient to establish "sexual penetration" of the victim. *See id.*

Defendant points to the lack of physical evidence of penetration in support of his contention that the evidence was insufficient to support his conviction. Although Nurse Dockery found no trauma or injury to R.R.'s vaginal area, she testified that such a finding was not abnormal in child sexual assault cases and that "[n]inety-five percent of the time you won't find any injuries." Nurse Dockery explained the lack of physical evidence of penetration, stating:

> Children have different meanings for penetration. Are they meaning that penetration went directly through the vaginal canal? Or are they talking

penetration -- just went through the -- it's called labia majora, which are the outer lips of the vagina. Did it just cross that?

Different -- depending on what kind of force was used, usually I won't find trauma if there wasn't a lot of force. And also the nature of the penetration.

When asked about why R.R. would have reported pain when Nurse Dockery could see no injury, Nurse Dockery explained, "Well, if the hymen is not estrogenized, it's very painful for the hymen to be touched for a pediatric female." In any event, in the context of child rape cases, "this court has repeatedly said that the State is not required to present physical evidence to corroborate a victim's testimony." *State v. Cordalle Benton*, No. W2016-00323-CCA-R3-CD, 2016 WL 4706850, at *5 (Tenn. Crim. App. Sept. 6, 2016) (compiling cases), *no perm. app. filed.* Defendant is not entitled to relief on this claim.

## B. Improper Prosecutorial Argument

Defendant contends that he is entitled to plain error relief based on two comments made by the prosecutor during trial. Defendant asserts that, while questioning Agent Lowe on redirect, the prosecutor "affirmatively stated that R.R. had been raped" and that this statement amounted to "prosecutorial 'testimony' . . . on the ultimate issue of guilt to be determined by the jury." Additionally, Defendant argues that the prosecutor improperly "contrasted slight penetration with complete destruction of the vagina[,]" during rebuttal closing argument, and that this comment was "not only tactless" but also "inflammatory and misleading." The State responds that Defendant has failed to establish that the alleged instances of prosecutorial misconduct constitute plain error. We agree with the State.

### 1. Alleged Improper Comments

For context, during the prosecutor's redirect examination of Agent Lowe, the following exchange occurred:

[THE STATE]: Also hypothetically, [defense counsel] mentioned a bed sheet on that. If two people were l[y]ing on the bed, would you expect to find both of their DNA on that bed?

[AGENT LOWE]: It is a possibility for the skin cells to be on the bed.

[THE STATE]: And he also asked you about the skin cells from the male on the female's bathing suit. If there was -- well intercourse -- *well in this case I guess she was raped,* but intercourse.

- 11 -

In that situation, in order for that to happen ideally, I mean obviously, the man would have touched the bathing suit. His body would have touched the bathing suit for his skin cells would be on that. Correct?

A. That is correct.

(emphasis added).

During defense counsel's closing argument, he stated:

We heard from Nurse Dockery. The Court determined that she was an expert. You can make your own determination whether you think she is an expert.

[Nurse Dockery] is a State's witness who is trying to justify -- who is trying to justify no medical results.

. . . .

If you accept that there was any sexual intercourse, so much as an adult male putting his penis inside an eleven[-]year[-]old's vagina and coming in and out, there would be trauma and injury.

. . . .

There's no medical evidence of any vaginal penetration. No injury of the vagina or hymen. Ladies and Gentlemen, you-all know better. If an adult male had sexually penetrated the vagina of an eleven[-]year[-]old girl, with his penis as she alleges, so much to the point that she feel sharp pain and blacked out, there would be an injury.

In response, the prosecutor stated during rebuttal closing argument:

[Defense counsel] wants to talk about Nurse Dockery, and how she's not an expert. But they sure do want to rely on the fact that she didn't find the vaginal trauma. And I think it's absolutely absurd to believe, as I've said to you before, that when a child is raped, that they had to be raped so much that it causes vaginal trauma.

Again, I tell you, she said the hymen is at the opening of the vagina. Now there has to be penetration to get there, but it is painful to be touched.

- 12 -

I don't care if his penis went three centimeters into her vagina, to touch her hymen, that is sexual penetration, and that is rape under the law of the State of Tennessee.

He doesn't have to go all the way in. *He doesn't have to completely destroy her vagina.* And Ladies and Gentlemen, he does not have to ejaculate inside of her.

(emphasis added).

## 2. Waiver

Defendant raised no contemporaneous objections to the prosecutor's comments. Additionally, Defendant failed to raise the claim of prosecutorial misconduct in his motion for new trial. Consequently, he has waived our consideration of the issue. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008) ("The failure to make a contemporaneous objection constitutes waiver of the issue on appeal."); Tenn. R. App. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of jurors, parties or counsel . . . unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived").

## 3. Plain Error

Nevertheless, Defendant asks this court to review the issue for plain error. "[W]hen necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Id.* at 640-41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

- 13 -

A trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

In *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003), this court listed five general areas of improper prosecutorial argument during closing: (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the improper argument of a prosecutor affected the verdict to the prejudice of the defendant:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.
>
> 2. The curative measures undertaken by the court and the prosecution.
>
> 3. The intent of the prosecutor in making the improper statement.
>
> 4. The cumulative effect of the improper conduct and any other errors in the record.
>
> 5. The relative strength or weakness of the case.

*Id.*

Here, Defendant has failed to show that a clear and unequivocal rule of law was breached when the prosecutor made the two comments. *Adkisson*, 899 S.W.2d at 640-41.

First, we conclude that the prosecutor was not expressing a personal belief as to the truth or falsity of the evidence or as to Defendant's guilt during her questioning of Agent Lowe on redirect. The State argues that "no reasonable observer would have concluded that the prosecutor was commenting about the ultimate issue in the case[,]" and we agree. The prosecutor framed her question to Agent Lowe as a hypothetical and began her question by saying, "*If* there was -- well intercourse . . . ." The prosecutor's change in phraseology, mid-question, from "intercourse" to "rape," which more accurately described what was alleged to have occurred, did not amount to a statement of fact about Defendant's guilt. We further agree with the State that "no reasonable observer would have thought that the State's expert witness was agreeing that R.R. was raped." Agent Lowe's answer, "That's correct," was a response to the prosecutor's question about the likelihood of finding skin cells on the victim's bathing suit if she had been raped as alleged by Defendant.

Regarding the prosecutor's comment during rebuttal closing argument, we conclude that the comment was made in response to defense counsel's repeated assertions during closing that the lack of physical and forensic evidence meant that Defendant had not penetrated the victim. In rebuttal, the prosecutor used forceful language that "[h]e doesn't have to completely destroy her vagina" to make the legitimate point that penetration does not require vaginal trauma, as defense counsel implied. *See Banks*, 271 S.W.3d at 131 ("[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices."). Here, the prosecutor did not stray from the evidence, make a derogatory remark, or appeal to the prejudices of the jury.

Under these circumstances, Defendant has failed to establish prosecutorial misconduct, and he is, therefore, not entitled to relief under plain error. *Smith*, 24 S.W.3d at 283 (concluding that when it is clear from the record that at least one of the *Adkisson* factors cannot be established, appellate courts need not consider the remaining factors).

## C. Consecutive Sentencing

Finally, Defendant argues that the trial court's imposition of consecutive sentences should be reversed because the trial court "issued that decision with no discussion or consideration of the factors that tend to necessitate consecutive sentencing." The State responds that the trial court properly exercised its discretion in ordering consecutive sentencing. We agree with the State.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of

discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210 (2018); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2018).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2018); *Bise*, 380 S.W.3d at 706. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2018), Sentencing Comm'n Cmts.

The Tennessee Supreme Court has held that the *Bise* standard applies to consecutive sentencing determinations "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds" for discretionary consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013). A trial court "may order sentences to run consecutively" if it finds by a preponderance of the evidence that the defendant:

> is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

Tenn. Code Ann. § 40-35-115(b)(5) (2018).

In this case, the trial court imposed consecutive sentencing based on its consideration of the discretionary consecutive sentencing factor found at Tennessee Code Annotated section 40-35-115(b)(5). The court also found that confinement was necessary "to avoid depreciating the seriousness of the offense" and that "confinement [was] particularly suited to provide an effective deterrent to others likely to commit similar crimes." The trial court clearly identified a statutory basis for imposing consecutive sentences. Accordingly, we will review the trial court's decision for an abuse of discretion with a presumption of reasonableness. *Pollard*, 432 S.W.3d at 861.

Upon review, we conclude that the trial court properly exercised its discretion in imposing consecutive sentences. The court applied the proper legal standard in reaching the decision, its logic and reasoning was not improper when viewed in the light of the facts of the case and relevant legal principles, and its decision was not based on a clearly erroneous assessment of the evidence. *See State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019); *Shaffer*, 45 S.W.3d at 555. In announcing the sentence, the trial court specifically referenced Tennessee Code Annotated section 40-35-115 and noted that "[w]hen a [d]efendant is convicted of two or more statutory offenses involving sexual abuse of a minor, then that is a factor that could be considered in discretionary consecutive sentencing." Tenn. Code Ann. § 40-35-115(b)(5) (2018).

Defendant does not dispute that he was convicted of two statutory offenses involving sexual abuse of a minor. He notes, however, that the trial court failed to make specific findings regarding the aggravating circumstances required in Tennessee Code Annotated section 40-35-115(b)(5), including: (1) the relationship between the defendant and victim or victims; (2) the time span of defendant's undetected sexual activity; (3) the nature and scope of the sexual acts; and (4) the extent of the residual, physical and mental damage to the victim or victims. Tenn. Code Ann. § 40-35-115(b)(5) (2018). Defendant argues that "[t]he trial court's rationale for imposing consecutive sentencing must go beyond merely classifying the offenses as those involving sexual conduct." However, Defendant offers no authority in support of this claim, and this court has previously applied a presumption of reasonableness and reviewed a trial court's imposition of consecutive sentences for abuse of discretion "[b]ecause the trial court provided reasons on the record establishing at least one of the seven grounds listed in [Section 115(b),]" despite the trial court's failure to "make specific findings regarding the other considerations required in subsection (5)." *State v. James Edward Church*, No. M2014-01306-CCA-R3-CD, 2016 WL 520616, at *12-13 (Tenn. Crim. App. Feb. 10, 2016), *perm. app. denied* (Tenn. June 23, 2016).

Here, we conclude that the record establishes the additional circumstances found in Tennessee Code Annotated section 40-35-115(b)(5). In sentencing Defendant, the trial court found that Defendant abused a position of private trust, explaining that Defendant

was the victim's stepfather whose job was to nurture the victim. The trial court also considered the victim's trial testimony regarding the nature and scope of the sexual acts. Specifically, the victim testified that, when she was eleven years old, Defendant penetrated her with his finger and his penis. Regarding the extent of the residual, physical, and mental damage to the victim, the victim's mother explained at sentencing that, prior to the offenses, the victim was a happy, outgoing, energetic child but that she was now "very quiet" and "tortured[,]" and the trial court found that Defendant's actions had "scar[red] the child forever." Thus, although the trial court did not explicitly consider the aggravating circumstances, it "implicitly provided reasons establishing a ground for the imposition of consecutive sentencing." *James Edward Church*, 2016 WL 520616, at *13. Defendant has not established an abuse of discretion, and he is not entitled to relief on this claim.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 18 -